**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**LINDA L. WISEMAN,**

     **Plaintiff,**

**v.**                          **Case No.: 3:14-cv-28750**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

     **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' briefs wherein they both request judgment on the pleadings. (ECF Nos. 12, 15).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **DENIED**; that the Commissioner's request for judgment on the pleadings be **GRANTED**; that the decision of the Commissioner be **AFFIRMED**;

1

and that this case be **DISMISSED**, **with prejudice,** and removed from the docket of the Court.

## I.   <u>Procedural History</u>

On April 5, 2012, Plaintiff Linda L. Wiseman ("Claimant") filed an application for DIB, alleging a disability onset date of March 31, 2012, due to "rheumatoid arthritis, irritable bowel syndrome, auto immune disorder, lower back pain, heart murmur, hypertension, pain and swelling in both feet and ankles, chronic fatigue, [and] vision problems." (Tr. at 186, 215). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 86, 98). Claimant filed a request for an administrative hearing, (Tr. at 101), which was held on January 12, 2014, before the Honorable Michelle M. Kelley, Administrative Law Judge ("ALJ"). (Tr. at 26-60). At the hearing, Claimant requested to amend her disability onset date to June 30, 2012, and the ALJ granted her request. (Tr. at 30-31). By written decision dated February 24, 2014, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 9-20). The ALJ's decision became the final decision of the Commissioner on September 23, 2014, when the Appeals Council denied Claimant's request for review. (Tr. at 1-3).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 8, 9). Claimant then filed a Brief in Support of Motion for Judgment on the Pleadings, (ECF No. 12), and the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 15). Consequently, the matter is fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 54 years old at the time that she filed the instant application for benefits, and 56 years old on the date of the ALJ's decision. (Tr. at 186). She has a high school education and communicates in English. (Tr. at 214, 216). Claimant has previously worked as a claims processor, office clerk, medical biller, receptionist, closing coordinator, and bookkeeper. (Tr. at 47, 216).

## III.    Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is

3

the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review," including the review performed by the ALJ. 20 C.F.R. § 404.1520a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b). If such impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and

4

concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual function. *Id.* § 404.1520a(d)(3). The Regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. § 404.1520a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2016. (Tr. at 11, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since March 31, 2012. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the severe impairment of "arthritis and soft tissue injuries to the ankles and feet." (Tr. at 11-14, Finding No. 3). The ALJ considered Claimant's additional alleged impairments of heart murmur, hypertension, autoimmune disorder, irritable bowel syndrome ("IBS"), chronic fatigue,

vision problems, and low back pain; however, the ALJ found these alleged impairments to be non-severe. (Tr. at 11-13). As to Claimant's reports of experiencing anxiety and depression, the ALJ found that these impairments did not cause more than minimal limitation in the Claimant's ability to perform basic mental work activities, and therefore, the ALJ found them to be non-severe. (Tr. at 13).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 14, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to lift, carry, push and pull 10 pounds frequently and 20 pounds occasionally; stand and walk six hours in an eight-hour workday; and sit six hours in an eight-hour workday. She can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but cannot climb ladders, ropes and scaffolds.

(Tr. at 14-18, Finding No. 5). At the fourth step, the ALJ found that Claimant was able to perform her past relevant work as a medical clerk, medical billing processor, real estate closer, general office clerk, receptionist, bank bookkeeper, hotel bookkeeper, and church bookkeeper. (Tr. at 18-19, Finding No. 6). Therefore, the ALJ found that Claimant was not disabled as defined in the Social Security Act, and was not entitled to benefits. (Tr. at 19, Finding No. 7).

## IV. __Claimant's Challenges to the Commissioner's Decision__

Claimant raises two challenges to the Commissioner's decision. First, Claimant asserts that the ALJ failed to fully develop the medical evidence related to Claimant's bilateral ankle and foot pain, arthritis, chronic fatigue, IBS, hypertension, anxiety, and vision problems. (ECF No. 12 at 9). According to Claimant, "given the absence of a full and complete development of the nature, location, and effect of [her] multiple medical

problems," the ALJ could not properly analyze her impairments as required by the Regulations. (*Id.* at 10-11). Intermixed within Claimant's criticism concerning the development of the record is a separate contention that the ALJ improperly "substituted opinions of the claimant's treating physicians for those of non-treating, record-reviewing state physicians." (*Id.* at 9). Claimant insists that the ALJ "ignored" the opinions of her treating physicians, Matthew Harris, M.D., and Mathew Samuel, M.D., and an examining physician, Gregory Chaney, M.D. (*Id.* at 10). With respect to Dr. Harris, Claimant argues that Dr. Harris recorded throughout his treatment notes that Claimant suffered from multiple impairments, including musculoskeletal pain, high blood pressure, elevated alkaline and phosphatase levels, IBS, dependent edema, and lower extremity fatigue and weakness. (*Id.*) As to Dr. Samuel, Claimant indicates that Dr. Samuel noted she suffered from severe tendinopathy, tenosynovitis, and a tendon and ligament tear with joint effusion in her left ankle. (*Id.*) Claimant asserts that Dr. Samuel recommended surgery for the structural damage in Claimant's ankle. (*Id.*) With regard to Dr. Chaney, Claimant avers that Dr. Chaney opined that Claimant has been disabled since March 2012. (*Id.*) Moreover, Dr. Chaney determined that Claimant experienced severe exertional limitations. (*Id.*)

In her second challenge, Claimant argues that "the ALJ failed to consider and properly evaluate [her] claim under the combination of impairments theory." (*Id.* at 11). Claimant contends that her "medical and mental problems," when considered in combination, support a finding of disability. (*Id.*) She asserts that the combination of her impairments meet or equal "the combination of impairments listing." (*Id.*) In support of her contention, Claimant cites the findings of Dr. Harris, Dr. Samuel, and Dr. Chaney. (*Id.* at 11-12). Within her second argument, Claimant again includes a criticism of the

ALJ's consideration of the opinion evidence. (*Id.* at 12).

In response, the Commissioner maintains that Claimant's arthritis responded well to medication and that her symptoms had diminished by the time that she stopped working in March 2012. (ECF No. 15 at 11). In support of her position, the Commissioner cites treatment records from Dr. Samuel and Marc A. Antonchak, M.D., which confirm that Claimant experienced relief from her arthritis symptoms in late 2011 and early 2012. (*Id.* at 11-12). With respect to Dr. Harris, the Commissioner argues that his treatment notes reflect Claimant's gait and muscle strength were normal and that prednisone helped relieve Claimant's arthritis symptoms. (*Id.* at 12). Furthermore, the Commissioner emphasizes that Dr. Harris never opined that Claimant could not work. (*Id.*) As for Dr. Chaney, the Commissioner contends that the ALJ properly assigned his opinion little weight because he was a one-time examining physician that filled out a check-box form without providing any explanation for his opinions. (*Id.*) In addition, the Commissioner insists that the ALJ appropriately considered Claimant's other alleged impairments. (*Id.* at 13). The Commissioner notes that the ALJ considered Claimant's allegations of cardiac impairment, autoimmune disorder, IBS, fatigue, vision problems, low back pain, and depression, and the ALJ correctly found that these impairments were non-severe. (*Id.* at 13-16).

## V.   <u>**Relevant Medical History**</u>

The undersigned has reviewed all of the evidence before the Court, including the records of Claimant's health care treatment and the medical opinion evidence. The relevant medical information is summarized as follows.

### A. Treatment Records

Claimant visited Timothy Saxe, M.D., at St. Mary's Family Care on January 19,

2011. (Tr. at 313-15). Claimant reported a family history of mitral valve prolapse; however, Dr. Saxe noted that Claimant had recently undergone a stress test and echocardiogram, which were both negative. (Tr. at 314). A review of systems was positive for palpitations, edema, and a history of heart murmur (*Id.*) Claimant denied experiencing any gastrointestinal or psychological symptoms. (*Id.*) Upon examination, Claimant appeared healthy. (Tr. at 315). Dr. Saxe recorded that cardiovascular, neurological, musculoskeletal, and psychiatric examinations were normal, except for some edema. (*Id.*) He diagnosed Claimant with dependent edema of the ankles and depression, and he ordered a bone density scan. (Tr. at 313). Later that month, on January 31, Claimant underwent a DXA scan at Pro Imaging Diagnostics. (Tr. at 310-12). The results of the examination revealed Claimant's bone density was normal with a low risk for fracture. (Tr. at 310).

Claimant reported to Joanna Stover, PA-C, on May 2, 2011 with complaints of bilateral ankle pain and swelling, which was worse in the left ankle. (Tr. at 317). Ms. Stover remarked that Claimant had a history of osteoarthritis, but not rheumatoid arthritis. (*Id.*) Claimant indicated that the majority of her ankle pain occurred when she first arose in the morning and after prolonged sitting; the pain decreased some after she walked around. (*Id.*) Her current medication consisted of Librax, which can be used to treat IBS, and ibuprofen 800 mg, which Claimant stated did not relieve her ankle pain. (*Id.*) Upon examination, Claimant appeared alert with a normal heart rate and rhythm. (Tr. at 318). Claimant's heart sounds and apical impulse were normal as well, and no murmurs were heard. (*Id.*) Ms. Stover noted no swelling and no tenderness in Claimant's ankles. (*Id.*) In addition, Ms. Stover observed that Claimant's ankles were not discolored and that pulses in the ankles were normal. (*Id.*) Ms. Stover assessed Claimant with hypertension,

palpitations, and osteoarthritis of both ankles. (Tr. at 319). She prescribed hydrochlorothiazide and Mobic. (*Id.*) Bilateral ankle x-rays were ordered, and Claimant was advised to wear supportive shoes with inserts. (*Id.*)

That same day, Claimant underwent x-rays of both ankles. (Tr. at 341-42). An x-ray of Claimant's left ankle revealed no bony abnormalities or joint effusion, but soft tissue swelling was present, which was greater laterally and was indicative of a possible sprain. (Tr. at 341). An x-ray of Claimant's right ankle revealed no bony or joint abnormality other than a small plantar calcaneal spur. (Tr. at 342).

On May 16, 2011, Claimant presented to the office of Matthew Harris, M.D., and was examined by Diana Stotts, C-FNP. (Tr. at 443-44). Claimant reported pain in her feet, ankles, and left leg. (Tr. at 443). She denied blurred or double vision; however, she indicated that she was far-sighted in one eye and near-sighted in the other. (*Id.*) Additionally, Claimant reported a history of IBS for which she had taken Librax, and she indicated that Librax "worked." (*Id.*) Claimant complained of pain in the soles of her feet that began one and one-half years prior to her visit; however, she stated that the pain had since moved to her ankles and left thigh. (*Id.*) Claimant reported that the pain was worse when sitting but improved once she stood up and moved around. (*Id.*) She also informed Ms. Stotts that Mobic helped the pain. (*Id.*) Claimant denied experiencing back pain or chest pain. (*Id.*) Ms. Stotts recorded that Claimant was prescribed hydrochlorothiazide for hypertension, and Claimant described experiencing stress over family issues. (*Id.*) Upon examination, Claimant's heart rate and rhythm were normal. (Tr. at 444). She was able to walk on heels and toes as well as tandem. (*Id.*) Examination of Claimant's feet revealed positive pedal pulse with tenderness doing any type of inversion or eversion of rotating both feet. (*Id.*) Claimant was diagnosed with musculoskeletal pain, high blood

pressure, IBS, and elevated alkaline and phosphatase levels, though Ms. Stotts observed that the levels were "not really that elevated." (*Id.*) Ms. Stotts ordered antinuclear antibody, rheumatoid factor, and sedimentation rate tests. (*Id.*)

Claimant visited Dr. Harris on June 20, 2011. (Tr. at 442). She reported an overwhelming sense of weakness in her legs along with joint pain. (*Id.*) Upon examination, Dr. Harris noted that Claimant was alert, oriented, and in no acute distress. (*Id.*) Her heart rate and rhythm were normal with no murmur. (*Id.*) Dr. Harris observed mild lower extremity pending edema; however, there was no joint abnormality. (*Id.*) Dr. Harris diagnosed Claimant with dependent edema and overwhelming lower extremity fatigue and weakness. (*Id.*) He prescribed Lasix and potassium for Claimant's edema. (*Id.*) He recorded that the etiology of Claimant's lower leg weakness was not clear, and as such, Claimant was referred for nerve conduction velocity/EMG studies. (*Id.*) Dr. Harris also advised Claimant to follow-up with a rheumatologist. (*Id.*)

On June 22, 2011, Claimant presented to Mathew P. Samuel, M.D., a rheumatologist at Tri-State Arthritis Center. (Tr. at 379). Claimant reported occasional arthritis symptoms beginning in high school, which included TMJ and thumb pain, although she indicated that she was symptom-free for ten to fifteen years. (*Id.*) Claimant informed Dr. Samuel that her most recent symptoms began eighteen months prior to her visit. (*Id.*) She described pain in both ankles, which she stated was not relived by Mobic. (*Id.*) She also reported that Dr. Harris performed blood tests and ordered x-rays, all of which were normal. (*Id.*) Upon examination, Claimant appeared in no apparent distress with normal mood and appropriate affect. (Tr. at 380). Examination of Claimant's cardiovascular system revealed no murmurs, gallops, rubs, or clicks. (*Id.*) Dr. Samuel observed that Claimant's left lateral malleolus exhibited diffused tenderness and swelling

11

with bony swelling of the lateral malleolar process areas. (*Id.*) The right medial malleolus showed diffused tenderness and swelling with tender inversion. (*Id.*) Claimant's muscle tone and strength were normal, and examination of the upper and lower extremities showed no proximal muscle tenderness or weakness. (*Id.*) A spinal examination revealed that Claimant's cervical range of motion, lumbar range of motion, and thoracic range of motion were normal. (*Id.*) Dr. Samuel recorded that the antinuclear antibody and rheumatoid tests were negative. (Tr. at 381). He assessed Claimant with unspecified inflammatory polyarthropathy, in a very unusual presentation, particularly with respect to Claimant's left ankle. (*Id.*) Dr. Samuel opined that the left ankle findings were suggestive of a disease producing bony swelling rather than soft tissue swelling localized to the lateral malleolar process. (*Id.*) He indicated that chronic trauma or Charcot's joint should be considered. (*Id.*)

Claimant presented to King's Daughters Medical Center on June 30, 2011 for an MRI of her left ankle. (Tr. at 405-06). Candace Howard-Claudio, M.D., recorded that the MRI revealed inflammation of the Kager's fat pad and extensive tenosynovitis. (Tr. at 406). She felt this might be seen in the setting of inflammatory arthropathies including, but not limited to, rheumatoid arthritis, ankylosing spondylitis, psoriasis, and Reiter's syndrome. (*Id.*) Dr. Howard- Claudio requested clinical correlation. (*Id.*)

Claimant returned to Dr. Samuel on July 6, 2011. (Tr. at 384). Dr. Samuel's examination findings remained the same. (Tr. at 384-85). Dr. Samuel assessed Claimant with unspecified inflammatory polyarthropathy. (Tr. at 386). He noted that Claimant was seronegative with a grossly abnormal MRI showing severe multiple tendinopathy, tenosynovitis, and tendon and ligament tear with joint effusion. (*Id.*) Dr. Samuel discussed the advanced and severe nature of the left ankle pathology with Claimant and

12

advised her to see an ankle surgeon for evaluation and management. (*Id.*) Claimant was prescribed prednisone. (*Id.*)

Claimant presented to St. Mary's Medical Center on July 18, 2011 for a nerve conduction study. (Tr. at 336). Suresh G. Kumar, M.D., opined that the nerve conduction study on both lower extremities was within normal limits. (*Id.*) A needle examination of Claimant's right lower extremity, including the lumbar paraspinal muscles, did not reveal any abnormalities. (*Id.*) Overall, the results indicated a normal study. (*Id.*)

Claimant returned to Dr. Samuel on August 3, 2011. (Tr. at 387). Dr. Samuel remarked that Claimant had been following the treatment plan with improvement. (Tr. at 388). Claimant denied experiencing any ankle pain or swelling. (*Id.*) Examination of both feet showed no evidence of clubbing, cyanosis, tenderness, synovitis, limitation of motion, effusion, petechiae, or ischemia. (*Id.*) Claimant's muscle strength was 5/5, and her muscle tone appeared normal. (*Id.*) Dr. Samuel recorded that Claimant's upper and lower extremities revealed no proximal muscle tenderness or weakness. (*Id.*) In addition, Dr. Samuel indicated that a spinal examination was normal. (*Id.*) Claimant was assessed with other specified inflammatory polyarthropathies, which Dr. Samuel opined were clinically stable. (Tr. at 389). Dr. Samuel advised Claimant that since she had progressed well taking prednisone, he did not think she had any major structural damage and surgery might not be necessary. (*Id.*) She was advised to continue taking prednisone and return in four weeks. (*Id.*)

On August 8, 2011, Claimant presented to Kirt T. Miller, DPM, after being referred by Dr. Harris for complaints of pain and swelling in both feet and ankles. (Tr. at 344). Claimant described her symptoms as worsening in the eighteen months prior to her appointment. (*Id.*) She indicated that she experienced pain in her ankles, her rear foot

region, and on the bottom of the foot (when she stood up). (*Id.*) However, Claimant expressed some improvement since she had started taking prednisone and indicated that she did not experience any complications with the medication. (*Id.*) Dr. Miller documented that there had been some concern that Claimant suffered from seronegative arthritis because of her symptoms; however, a definitive diagnosis had not been made. (*Id.*) Dr. Miller also recorded that Claimant had hypertension, which was controlled. (Tr. at 345). Upon examination, Claimant appeared alert, oriented, cooperative, and in no acute distress. (*Id.*) Dr. Miller observed that Claimant's lower extremities showed palpable vascular DP and PT pulses, and the capillary refill time was immediate in Claimant's toes bilaterally. (*Id.*) Claimant's epicritic sensation was intact and symmetrical in both legs, and Dr. Miller observed no gross amount of erythema or edema in either foot. (*Id.*) An orthopedic examination of Claimant's feet and ankles revealed no gross amount of pain, irritation, limited range of motion, or crepitation. (Tr. at 346). Dr. Miller assessed Claimant with seronegative arthritis and associated pain, improved. (*Id.*) He recorded that Claimant exhibited characteristics of seronegative arthritis and opined that Claimant's symptoms would improve. (*Id.*) Dr. Miller did not believe that Claimant was a candidate for surgery. (*Id.*) Dr. Miller also believed that Claimant suffered from plantar fasciitis, some plantar fascial strain, and pes planus. (*Id.*) He advised Claimant to return in one month and noted that he would consider orthotic options. (*Id.*)

Claimant returned to Dr. Harris on August 22, 2011, reporting that she continued to experience relief of her foot pain with prednisone. (Tr. at 440). Dr. Harris remarked that Claimant appeared alert, oriented, and in no acute distress. (*Id.*) Her heart rate and rhythm were found to be regular with no murmur. (*Id.*) Upon examination, Dr. Harris observed no acute change in Claimant's feet. (*Id.*) Dr. Harris assessed Claimant with

dysuria and bilateral foot pain, possibly autoimmune. (*Id.*) Claimant was advised to follow up with Dr. Samuel. (*Id.*)

On August 31, 2011, Claimant again visited Dr. Samuel, who found that Claimant was following the treatment plan and showing improvement. (Tr. at 391). A review of systems was negative for joint swelling, pain, or morning stiffness. (*Id.*) Cardiovascular and neurological examinations were both unremarkable. (*Id.*) Dr. Samuel's inspection of Claimant's upper and lower extremities showed no active synovitis, limitation of motion, or effusions. (*Id.*) Claimant's feet were negative for clubbing, cyanosis, tenderness, synovitis, limitation of motion, effusion, petechiae, and ischemia. (*Id.*) Dr. Samuel recorded that Claimant's muscle strength in all groups tested was 5/5, and that Claimant's muscle tone was normal. (*Id.*) Dr. Samuel also noted that Claimant's cervical, thoracic, and lumbar spine range of motion were normal. (*Id.*) Claimant was assessed with other specified inflammatory polyarthropathies. (*Id.*) Dr. Samuel noted that Claimant's condition was clinically stable, so he would begin tapering off her prednisone. If that was not successful, he would try steroid sparing agents.. (Tr. at 392).

On September 8, 2011, Claimant followed up with Dr. Miller, who noted Claimant's prednisone was being tapered, but she was still doing much better. (Tr. at 343). A review of systems revealed no lower extremity edema; however, Claimant did report cramping in the evenings and intermittent flu-like symptoms for the previous five weeks. (*Id.*) Upon examination, Dr. Miller observed no erythema or edema in Claimant's feet. (*Id.*) He also noted that Claimant did not exhibit pain or limited range of motion in the feet during the examination. (*Id.*) Claimant was assessed with improved seronegative arthritis and associated ankle pain. (*Id.*) Dr. Miller noted that Claimant's pain was resolving, and consequently, conservative treatment would be continued. (*Id.*) He

provided Claimant with arch supports for her shoes. (*Id.*)

On September 28, 2011, Claimant returned to Dr. Samuel, who remarked that Claimant had experienced moderate improvement with treatment. (Tr. at 429). However, Claimant indicated that she experienced increased ankle pain when her prednisone was reduced to 2.5 mg daily. (*Id.*) Claimant denied any ankle swelling. (*Id.*) Claimant also reported morning stiffness lasting more than fourteen minutes and joint pain. (*Id.*) Upon examination, Claimant was oriented and in no distress. (Tr. at 430). Cardiovascular, spinal, and psychiatric examinations were unremarkable. (*Id.*) A straight-leg raise test was negative. (*Id.*) Dr. Samuel's examination of Claimant's metatarsophalangeal ("MTP") and interphalangeal ("IP") joints of the feet revealed no synovitis, tenderness, effusion, deformities, or limitation of movement. (*Id.*) Claimant's diagnosis remained the same, and Dr. Samuel added Azulfidine to Claimant's regimen. (Tr. at 430-31). Dr. Samuel also increased Claimant's prednisone dosage to 5 mg each morning and ordered blood tests. (Tr. at 431).

Claimant again treated with Dr. Samuel on October 26, 2011. (Tr. at 433). Dr. Samuel noted that Claimant had "good improvement" and tolerated Azulfidine well. (*Id.*) Claimant denied any new symptoms. (*Id.*) A review of Claimant's musculoskeletal system was negative for morning stiffness lasting more than fifteen minutes, joint pain, and joint swelling. (Tr. at 434). Dr. Samuel's examination findings remained the same, and he opined that Claimant's condition was improving. (Tr. at 434-35).

On November 1, 2011, Claimant returned to Dr. Harris. (Tr. at 439). Upon examination, Claimant was alert, oriented, and in no acute distress. (*Id.*) Dr. Harris noted no acute change in Claimant's arthritis. (*Id.*) Claimant was advised to follow up with her rheumatologist. (*Id.*)

Claimant next visited Dr. Samuel on December 7, 2011. (Tr. at 425). Claimant denied any new symptoms. (*Id.*) Dr. Samuel indicated that Claimant continued to experience "good improvement" with treatment. (*Id.*) He noted that Claimant was no longer on steroids and reported only minimal flare ups, especially while on her feet. (*Id.*) Dr. Samuel's examination findings were unchanged, and he assessed Claimant with unspecified inflammatory polyarthropathy. (Tr. at 426-27). Dr. Samuel opined that Claimant was improving, and he increased Claimant's Azulfidine dosage. (Tr. at 427).

On January 4, 2012, Claimant returned to Dr. Samuel reporting moderate improvement; however, Claimant indicated that she still experienced pain and swelling in both ankles, which was worse by the end of the day. (Tr. at 417). Upon examination, Claimant's mood and affect were normal, and she was in no acute distress. (Tr. at 418). Inspection of Claimant's shoulders, elbows, hips, ankles, and knees revealed no synovitis, effusion, deformities, or limitation of movement. (*Id.*) Dr. Samuel noted very minimal tenderness on eversion and inversion movement of the ankles. (*Id.*) He also observed bilateral pitting edema in both legs. (*Id.*) In addition, he observed that the MTP and IP joints of the feet showed no synovitis, tenderness, effusion, deformities, or limitation of movement. (*Id.*) Claimant's muscle tone and coordination were normal. (*Id.*) A spinal examination was normal, and a straight-leg raise test was negative. (*Id.*) Claimant was assessed with unspecified inflammatory polyarthropathy, seronegative arthritis, and edema. (Tr. at 418-19). Dr. Samuel opined that Claimant's condition was improving. (Tr. at 419). Claimant was instructed to continue her medications and visit Dr. Harris for her leg edema. (*Id.*)

Claimant returned to Dr. Harris on January 16, 2012 complaining of unrelenting fatigue. (Tr. at 438). She reported that she felt extremely tired and had difficulty

completing tasks. (*Id.*) Claimant also described experiencing shortness of breath and severe bilateral foot pain. (*Id.*) Upon examination, Dr. Harris observed trace edema of Claimant's lower extremities. (*Id.*) Claimant was assessed with fatigue, dyspnea, and arthritis. (*Id.*) Dr. Harris ordered blood work and an echocardiogram. (*Id.*)

Claimant presented to King's Daughters Medical Center on January 26, 2012, for an echocardiogram. (Tr. at 347-48). The results of the echocardiogram indicated that the left ventricular ejection fraction was estimated at 65. (Tr. at 347). There was normal right and left ventricular wall thickness, right ventricular function, and right and left atria size. (*Id.*) Claimant's mitral valve leaflets appeared normal as did her aortic valve. (*Id.*) No significant pulmonic regurgitation or stenosis was found. (*Id.*) Claimant's aortic root was not well visualized, and her pericardium appeared normal. (Tr. at 347-48).

Claimant followed up with Dr. Harris on February 21, 2012. (Tr. at 437). Claimant appeared alert, oriented, and in no acute distress. (*Id.*) Upon examination, Claimant's heart rate and rhythm were regular with no murmur, and her lungs were clear to auscultation. (*Id.*) Dr. Harris remarked that Claimant was neurologically intact with adequate short-term and long-term memory. (*Id.*) Claimant's muscle tone, muscle strength, coordination, and gait were normal. (*Id.*) Dr. Harris assessed Claimant with fatigue, but he indicated that the etiology was not clear. (*Id.*) He ordered a sleep study and prescribed Nuvigil. (*Id.*)

On February 27, 2012, Claimant presented to the Columbus Arthritis Center to see rheumatologist Marc A. Antonchak, M.D. (Tr. at 357-60). Claimant reported bilateral mid foot and bilateral forefoot pain, which measured a severity level of 8 at the time of the appointment. (Tr. at 358). Claimant described her symptoms as "achy" and stated that the pain increased with the use of her feet. (*Id.*) She informed Dr. Antonchak that her pain

was exacerbated by standing, walking, and climbing stairs. (*Id.*) Claimant also complained of limitations in activity, fatigue, joint swelling in her feet, and morning stiffness. (*Id.*) Claimant denied experiencing any headache, limping, paresthesia, back pain, or weakness. (*Id.*) Claimant reported no respiratory, cardiovascular, or gastrointestinal symptoms. (Tr. at 359). She also denied experiencing anxiety, depression, insomnia, gait disturbance, memory impairment, or extremity numbness. (*Id.*) Upon examination, Claimant was oriented with an appropriate mood and affect. (Tr. at 360). Dr. Antonchak noted mild tenderness in Claimant's shoulders. (*Id.*) Claimant's elbows, hands, hips, and knees displayed full range of motion and no deformity, heat, swelling, erythema, or effusion. (*Id.*) Dr. Antonchak observed that Claimant's right foot and ankle were negative for joint deformity, heat, swelling, erythema, or effusion, and they exhibited full range of motion. (*Id.*) Claimant's left foot and ankle exhibited moderate tenderness. (*Id.*) Dr. Antonchak recorded that Claimant's Routine Assessment of Patient Index Data score was .0, which indicated near remission. (*Id.*) Dr. Antonchak assessed Claimant with spondyloarthropathy unspecified and believed that this was the cause of Claimant's arthritis. (*Id.*) He also remarked that Claimant had a partial ligament tear, but opined that surgery was not necessary. (*Id.*) Dr. Antonchak further indicated that prescription sulfasalazine was not completely effective in treating Claimant's condition; as such, he recommended a trial of methotrexate for three to four months. (*Id.*) Claimant requested an injection for pain control and inflammation, which was provided to her. (*Id.*)

Claimant treated with Dr. Samuel on February 28, 2012. (Tr. at 421). Claimant continued to complain that her ankles hurt and swelled by the end of the day. (*Id.*) Dr. Samuel noted that Claimant had minimal improvement with treatment; however, Claimant stated that she was not improving. (*Id.*) A review of systems was negative for

fatigue, but positive for morning stiffness lasting one half hour, and joint pain and swelling in the ankles. (*Id.*) However, Claimant denied experiencing muscle weakness and tenderness. (*Id.*) Upon examination, Claimant appeared alert, oriented, and in no distress. (Tr. at 422). Her mood and affect were normal. (*Id.*) Cardiovascular, abdominal, and pulmonary examinations were unremarkable. (*Id.*) Dr. Samuel's examination of Claimant's shoulders, elbows, hips, ankles, and knees did not reveal any synovitis, effusion, deformities, or limitation of movement. (*Id.*) There was minimal tenderness on inversion and movement of Claimant's left ankle, but there was no warmth, redness, or synovitis in either ankle. (*Id.*) Dr. Samuel observed bilateral pitting edema in both legs. (*Id.*) He also recorded minimal pes planus and no sign of synovitis, tenderness, effusion, deformity, or limitation of movement in Claimant's MTP and IP joints. (*Id.*) Additionally, Claimant's coordination, muscle tone, and spine were all normal. (*Id.*) Dr. Samuel assessed Claimant with unspecified inflammatory polyarthropathy, seronegative arthritis, and pes planus. (Tr. at 422-23). He remarked that Claimant's condition was stable, but still symptomatic. (Tr. at 423). Dr. Samuel discussed with Claimant the absence of clinical evidence of active ankle inflammation based upon his examination. (*Id.*) He advised Claimant to obtain a second evaluation by a rheumatologist as he could not explain her worsening symptoms. (*Id.*) He opined that Claimant's ankle symptoms could be partly related to her flat feet. (*Id.*)

Claimant presented to Dr. John Romans, optometrist, on March 1, 2012 for a routine checkup. (Tr. at 374-76). She reported blurred vision and tired eyes. (Tr. at 374). As to her medical history, Claimant indicated that she underwent Lasik surgery on her right eye in 2006. (Tr. at 374). Dr. Romans assessed Claimant with myopia and astigmatism. (Tr. at 375). Claimant received a prescription for glasses. (Tr. at 456).

On March 9, 2012, Claimant presented to King's Daughters Medical Center for an MRI of her left ankle. (Tr. at 238-39). Dr. Howard-Claudio noted that the MRI was compared to a June 30, 2011 MRI. (Tr. at 238). The MRI results showed extensive inflammation of the Kager's fat pad and extensive tenosynovitis, which might be seen in the setting of inflammatory arthropathies including, but not limited to, a HLA-B27 inflammatory arthropathy such as ankylosing spondylitis, Reiter's syndrome, psoriasis, or rheumatoid arthritis. (Tr. at 239). Comparing this MRI with the June 2011 MRI, Dr. Howard-Claudio indicated that the most recent MRI showed the "disease" was stable. (*Id.*)

Claimant returned to Dr. Samuel on March 13, 2012. (Tr. at 413). Dr. Samuel noted that the recent left ankle MRI showed resolution of the inflammatory changes reported in the June 2011 MRI; however, the anatomical damage of the tendons and ligaments remained unchanged. (*Id.*) He also recorded that there was nothing to suggest any inflammatory arthritis; however, pes planus and foot instability were reported. (*Id.*) In addition, Dr. Samuel indicated that a recent C-reactive protein blood test was normal. (*Id.*) A review of systems was negative for fatigue, muscle weakness, and muscle tenderness. (Tr. at 413-14). Cardiovascular, pulmonary, abdominal, spinal, and psychiatric examinations were all normal. (Tr. at 414). Dr. Samuel observed that Claimant's ankles did not show any synovitis, effusion, deformities, or limitation of movement; however, Claimant experienced very minimal tenderness on inversion movement of the left ankle. (*Id.*) There was no warmth, redness, or synovitis in either ankle. (*Id.*) Dr. Samuel discussed the absence of clinical or serological evidence of active inflammation of the ankles, and he advised Claimant that changing the disease-modifying antirheumatic medications and adding methotrexate might not offer relief as she had

structural damage that would require surgical intervention. (Tr. at 415). He advised Claimant to return to her ankle specialist for further treatment options. (*Id.*)

Six months later, on September 25, 2012, Claimant presented to Dr. Harris for complaints of fatigue. (Tr. at 445). Claimant stated that, in the last two years, prolonged activity aggravated the condition, but she felt better after she stopped working. (*Id.*) Claimant informed Dr. Harris that she felt okay in the mornings, but began to experience fatigue three hours after waking up. (Tr. at 446). Claimant's medications at that time included vitamin D2 and Librax. (Tr. at 445). Claimant denied experiencing chest pain, shortness of breath, and depression. (Tr. at 446). She reported that she suffered from IBS, but Librax helped. (*Id.*) She also reported riding a bike every day for fifteen minutes. (*Id.*) Cardiovascular, respiratory, neurologic, and gastrointestinal examinations were unremarkable. (*Id.*) Claimant demonstrated normal coordination, mood, and affect. (*Id.*) Her recent and remote memory were intact, and she exhibited normal judgment and insight. (*Id.*) Dr. Harris diagnosed Claimant with fatigue, malaise, and weakness. (*Id.*) Claimant declined a prescription for Wellbutrin, and Dr. Harris instructed Claimant to return in six months. (*Id.*)

Claimant returned to Dr. Harris on March 26, 2013 for chief complaints of fatigue and vitamin D deficiency. (Tr. at 465). Claimant also reported swelling in her feet and both swelling and pain in her ankles. (Tr. at 466). Claimant denied experiencing chest pain, heart palpitations, and heart murmur. (*Id.*) Upon examination, Claimant had a regular heart rate and rhythm with no murmur. (*Id.*) Her respiratory and gastrointestinal examinations were normal. (*Id.*) Dr. Harris recorded that Claimant demonstrated normal judgment and insight with intact recent and remote memory. (*Id.*) Claimant's mood and affect were normal. (*Id.*) Overall, Dr. Harris noted that Claimant's examination was

normal. (*Id.*) He assessed Claimant with fatigue, malaise, weakness, and IBS. (*Id.*) Claimant was continued on Librax and vitamin D2. (*Id.*)

Claimant returned to Dr. Harris's office on July 18, 2013 and saw Teresa Twohig, C-FNP. (Tr. at 462). At that visit, Claimant reported anxiety and insomnia. (*Id.*) She explained having anxiety for the prior two weeks with moderate symptoms, but indicated that her symptoms had gotten worse. (*Id.*) She reported crying often along with feeling irritable and anxious. (*Id.*) Claimant informed Ms. Twohig that her sister had recently died and that she was taking care of her elderly father. (*Id.*) Claimant denied experiencing problems with her memory, a decrease in cognitive skills, and numbness. (Tr. at 463). She did report depression, irritability, and the inability to stay asleep. (*Id.*) Upon examination, Ms. Twohig remarked that Claimant was alert and oriented with normal judgment and insight. (*Id.*) Claimant's recent and remote memory were intact, and she demonstrated a normal mood and affect. (*Id.*) Ms. Twohig diagnosed Claimant with anxiety, depression, and insomnia. (*Id.*) She prescribed fluoxetine and Xanax for Claimant's anxiety and depression as well as Trazadone for her insomnia. (*Id.*)

On September 26, 2013, Claimant followed up with Dr. Harris. (Tr. at 459). Dr. Harris observed that Claimant's anxiety symptoms had improved with medication. (*Id.*) With respect to Claimant's IBS, she reported constipation alternating with diarrhea; however, she was not experiencing abdominal pain. (*Id.*) Claimant also reported suffering from joint pain and aching muscles. (Tr. at 460). Dr. Harris recorded that cardiovascular and respiratory examinations were normal. (*Id.*) He remarked that Claimant's gait, station, and coordination were all normal. (*Id.*) Claimant exhibited normal judgment, insight, and recent and remote memory. (*Id.*) Dr. Harris observed that Claimant's mood and affect were abnormal as she was crying during the appointment. (*Id.*) He assessed

Claimant with anxiety and continued her on Xanax. (*Id.*) Additionally, Dr. Harris noted that Librax was working well for Claimant's IBS. (*Id.*) Claimant was advised to follow up in six months. (Tr. at 461).

### B. Evaluations and Opinions

On June 19, 2012, Henry Scovern, M.D., completed a Physical RFC Evaluation. (Tr. at 66-68). With respect to exertional limitations, Dr. Scovern opined that Claimant could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk with normal breaks for a total of four hours in an eight-hour workday; sit with normal breaks for six hours in an eight-hour work day; and push/pull without limitation (other than Claimant's lifting and/or carrying limitations). (Tr. at 66-67). As for postural limitations, Dr. Scovern opined that Claimant could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl; however, Claimant could never climb ladders, ropes, or scaffolds. (Tr. at 67). In support of these postural limitations, Dr. Scovern cited Claimant's mid-foot and forefoot pain. (*Id.*) In addition, Dr. Scovern found that Claimant had no manipulative, visual, communicative, or environmental limitations. (*Id.*) In the explanation portion of the RFC form, Dr. Scovern summarized treatment notes from Dr. Miller, Dr. Harris, Dr. Samuel, and Dr. Antonchak. (Tr. at 67-68). Dr. Scovern remarked that Claimant experienced ongoing left ankle pain as a result of soft tissue damage, but indicated that Claimant's ankle inflammation had resolved. (Tr. at 68). He noted that there was no indication of rheumatoid arthritis and that there was no evidence of impairment from back pain, heart problems, fatigue, vision, or IBS. (*Id.*)

On November 21, 2012, Rabah Boukhemis, M.D., reviewed Dr. Scovern's Physical RFC Evaluation on reconsideration. (Tr. at 78-79). Dr. Boukhemis considered Claimant's March 2012 left ankle MRI showing extensive tenosynovitis. (Tr. at 79). Notwithstanding,

Dr. Boukhemis affirmed the physical limitations found by Dr. Scovern. (*Id.*)

On January 21, 2014, Gregory Chaney, M.D., completed a Residual Physical Functional Capacity Evaluation form. (Tr. at 477). Dr. Chaney recorded that Claimant's primary diagnoses were rheumatoid arthritis and autoimmune disorder. (*Id.*) Additionally, he noted that Claimant's secondary diagnoses were low back pain and chronic fatigue. (*Id.*) He added that Claimant also reported experiencing heart murmur, IBS, hypertension, and vision problems. (*Id.*) As to exertional limitations, Dr. Chaney opined that Claimant could occasionally lift and/or carry less than ten pounds; stand and/or walk less than two hours in an eight-hour workday; and sit less than two hours in an eight-hour workday. (*Id.*) Dr. Chaney also determined that Claimant possessed limited ability to push and pull in both her upper and lower extremities. (*Id.*) With regard to postural limitations, Dr. Chaney determined that Claimant could occasionally balance or stoop; however, she could never kneel, crouch, crawl, or climb ramps, stairs, ladders, rope, or scaffolds. (*Id.*) Dr. Chaney found that Claimant had no manipulative or communicative limitations. (*Id.*) As for environmental limitations, Dr. Chaney opined that Claimant could have unlimited exposure to noise, fumes, or odors, and should avoid moderate exposure to vibration. (*Id.*) Furthermore, Claimant should avoid all exposure to extreme cold, extreme heat, wetness, humidity, and hazards, such as machinery and heights. (*Id.*) Dr. Chaney concluded that Claimant had been disabled since March 2012. (*Id.*)

## VI.   **Scope of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v.*

*Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable Regulations and Rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

**VII.    Discussion**

### A. Duty to Develop the Record

Claimant contends that the ALJ failed to fully develop the record with regard to her bilateral ankle and foot pain, arthritis, chronic fatigue, IBS, hypertension, anxiety, and vision problems. (ECF No. 12 at 9). According to Claimant, "given the absence of a full and complete development of the nature, location, and effect of [her] multiple medical problems," the ALJ could not properly analyze her impairments as required by the Regulations. (*Id.* at 10-11). Having reviewed the record in full, the undersigned finds that this argument is without merit.

Certainly, an ALJ has the duty to fully and fairly develop the record. *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986). However, an ALJ is not required to act as a

claimant's counsel. *Bell v. Chater*, 57 F.3d 1065, 1995 WL 347142, at *4 (4th Cir. June 9, 1995) (unpublished table decision) (citing *Clark v. Shalala,* 28 F.3d 828, 830-31 (8th Cir. 1994)). The ALJ has the right to presume that a claimant's counsel presented the strongest case for benefits. *Nicholson v. Astrue,* 341 F. App'x 248, 253 (7th Cir. 2009) (citing *Glenn v. Sec'y of Health & Human Servs.*, 814 F.2d 387, 391 (7th Cir. 1987)). Ultimately, "[a]lthough the ALJ has the duty to develop the record, such a duty does not permit a claimant, through counsel, to rest on the record ... and later fault the ALJ for not performing a more exhaustive investigation." *Maes v. Astrue*, 522 F.3d 1093, 1097 (10th Cir. 2008).

Indeed, "[a]n ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001). When considering the adequacy of the record, a court must look for evidentiary gaps that result in "unfairness or clear prejudice" to the claimant. *Brown v. Shalala,* 44 F.3d 931, 935 (11th Cir. 1995). A remand is not warranted every time a claimant alleges that the ALJ failed to fully develop the record. *Id.* at 935 (finding that remand is appropriate when the absence of available documentation creates the likelihood of unfair prejudice to the claimant). In other words, remand is improper, "unless the claimant shows that he or she was prejudiced by the ALJ's failure. To establish prejudice, a claimant must demonstrate that he or she could and would have adduced evidence that might have altered the result." *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000) (internal citations omitted).

In this case, Claimant, who was represented by counsel at her administrative hearing, has neglected to identify any evidentiary gaps in the record. *See Copley v. Colvin*, No. 3:14-cv-18270, 2015 WL 4621641, at *26 (S.D.W.Va. July 10, 2015) (rejecting

identical argument where claimant did not identify evidentiary gaps), *report and recommendation adopted by* 2015 WL 4624075 (S.D.W.Va. July 31, 2015); *Nye v. Colvin*, No. 3:13-12115, 2014 WL 2893199, at *20 (S.D.W.Va. June 26, 2014) (same). Furthermore, she has entirely failed to proffer what evidence could have been adduced that might have changed the result of the proceedings. *See Scarberry v. Chater*, 52 F.3d 322, 1995 WL 238558, at *4 n.13 (4th Cir. Apr. 25, 1995) (unpublished table decision) (rejecting failure to develop record argument where claimant did not "identify what the missing evidence would have shown"). The ALJ thoroughly reviewed and considered Claimant's medical records, scrutinized the opinions provided by Dr. Chaney and the state agency medical consultants, and examined both Claimant's testimony and adult function reports. *See Toney v. Shalala*, 35 F.3d 557, 1994 WL 463427, at *2 (4th Cir. Aug. 29, 1994) (unpublished table decision) (holding record was adequately developed where ALJ considered examination reports, medical opinions, claimant's testimony, medical records, and vocational expert testimony). The medical records and opinion evidence considered by the ALJ certainly encompassed Claimant's allegations related to her ankle and foot pain, arthritis, chronic fatigue, IBS, hypertension, anxiety, and visions problems. (Tr. at 11-17). Claimant's argument boils down to circular logic—the record could not have been well-developed because her application for benefits was denied, and her application was denied because the record was incomplete. That will not suffice for remand. Ultimately, the record was well-developed and certainly provided more than adequate information upon which the ALJ could properly evaluate Claimant's application for benefits. An adverse decision alone does not entitle Claimant to a remand for further factual development. Accordingly, the undersigned **FINDS** that the ALJ did not err by failing to more fully develop the record.

### B. The ALJ's Evaluation of Opinion Evidence

As mentioned above, interspersed in Claimant's development of the record argument is a separate contention that the ALJ improperly "substituted opinions of the claimant's treating physicians for those of non-treating, record-reviewing state physicians," in violation of applicable law. (ECF No. 12 at 9). In particular, Claimant avers that the ALJ "ignored" the opinions of Dr. Harris, Dr. Samuel, and Dr. Chaney. (*Id.* at 10).

When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. § 404.1527(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* § 404.1527(a)(2). Title 20 C.F.R. § 404.1527(c) outlines how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. In general, an ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* § 404.1527(c)(1). Even greater weight should be allocated to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* § 404.1527(c)(2). Indeed, a treating physician's opinion should be given ***controlling*** weight when the opinion is supported by clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. *Id.* If the ALJ determines that a treating physician's opinion is not entitled to controlling weight, the ALJ must then analyze and weigh all the medical opinions of record, taking into account certain factors

listed in 20 C.F.R. § 404.1527(c)(2)-(6),[1] and must explain the reasons for the weight given to the opinions.[2] "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *4. Nevertheless, a treating physician's opinion may be rejected in whole or in part when there is persuasive contrary evidence in the record. *Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1987). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays,* 907 F.2d at 1456.

Medical source statements on issues reserved to the Commissioner, however, are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183 (S.S.A. 1996). In both the Regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s)

---

[1] The factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.

[2] Although 20 C.F.R. § 404.1527(c) provides that in the absence of a controlling opinion by a treating physician, all of the medical opinions must be evaluated and weighed based upon various factors, the Regulation does not explicitly require the ALJ to recount the details of that analysis in the written opinion. Instead, the Regulation mandates only that the ALJ give "good reasons" in the decision for the weight ultimately allocated to medical source opinions. *Id.* § 404.1527(c)(2); *see also* SSR 96-2p, 1996 WL 374188, at *5 (stating that when a decision is not fully favorable, "the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."). "[W]hile the ALJ also has a duty to 'consider' each of the ... factors listed above, that does not mean that the ALJ has a duty to discuss them when giving 'good reasons.' Stated differently, the regulations require the ALJ to consider the ... factors, but do not demand that the ALJ explicitly discuss each of the factors." *Hardy v. Colvin,* No. 2:13–cv–20749, 2014 WL 4929464, at *2 (S.D.W.Va. Sept. 30, 2014).

but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability;" including the following:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
>
> 2. What an individual's RFC is;
>
> 3. Whether an individual's RFC prevents him or her from doing past relevant work;
>
> 4. How the vocational factors of age, education, and work experience apply; and
>
> 5. Whether an individual is "disabled" under the Act.

*Id.* at *2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* As such, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at *2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at *3.

Claimant first argues that the ALJ "ignored" Dr. Harris's opinion. (ECF No. 12 at 10). The only opinions from Dr. Harris to which Claimant refers are the diagnoses contained in his treatment records. Specifically, Claimant asserts that Dr. Harris opined Claimant suffered from "a multitude of injuries and impairments, including but not limited to, musculoskeletal pain, high blood pressure, elevated alkaline and phosphatase,

[IBS], dependent edema, and overwhelming lower extremity fatigue and weakness."[3] (*Id.*)

In the written decision, the ALJ summarized Dr. Harris's treatment records spanning from August 2011 to September 2013. (Tr. at 11-13, 15-17) (referencing Dr. Harris's treatment records contained in Exhibits 14F and 18F of the administrative record). The ALJ acknowledged the symptoms that Claimant reported at her visits with Dr. Harris and the diagnoses that Dr. Harris recorded in the treatment notes. Over the course of Claimant's treatment with Dr. Harris, he diagnosed her with IBS; fatigue; overwhelming lower extremity fatigue and weakness; dependent edema; bilateral foot pain, possibly autoimmune; inflammatory polyarthropathy; anxiety; depression; and insomnia. (Tr. at 12-13, 15, 437-39, 440, 442, 445, 460, 463, 466). The ALJ considered all of these conditions throughout her written decision and found many of them were non-severe with treatment or did not significantly limit a work-related function. (Tr. at 12-13, 15-17). For instance, the ALJ noted that Claimant reported Librax worked well in treating her IBS in both May 2011 and September 2013. (Tr. at 12). The ALJ also recognized that Dr. Harris has diagnosed Claimant's foot pain as "possibly autoimmune" in August 2011, however, there was no subsequent evidence that Claimant suffered from an autoimmune disorder. (*Id.*) Moreover, the ALJ acknowledged Claimant's complaints of fatigue at visits with Dr. Harris, but remarked that the examination findings at those visits were normal, including neurological examination findings and blood test results. (*Id.*) Additionally, the ALJ addressed Claimant's diagnoses of depression and anxiety. (Tr. at 13). The ALJ noted that Claimant's mental status examination findings were often normal and that she reported her mental health had improved in September 2013 after being placed on

---

[3] The diagnoses of high blood pressure and elevated alkaline and phosphatase levels were assigned to Claimant by Ms. Stotts, who worked in Dr. Harris's office, and not Dr. Harris. (Tr. at 444). In any event, the ALJ thoroughly addressed Claimant's allegation of hypertension at step two. (Tr. at 11-12).

medication in July 2013. (*Id.*) The ALJ extensively considered Claimant's lower extremity impairment as well, and she determined at step two that Claimant suffered from the severe impairment of arthritis and soft tissue injuries to the ankles and feet. (Tr. at 14). As discussed in detail below, the ALJ then examined the evidence related to Claimant's foot and ankle impairment throughout the written decision. (Tr. at 14-18). Thus, contrary to Claimant's contention, the ALJ clearly did not ignore Dr. Harris's diagnoses of Claimant's ailments.

In addition, the ALJ noted that Claimant had not submitted any opinion evidence from a treating physician indicating that she was disabled or possessed functional limitations greater than those contained in the ALJ's RFC finding. (Tr. at 17). Indeed, Dr. Harris did not opine that Claimant could not work. Moreover, he did not supply any opinion as to "what [Claimant] can still do despite [her] impairment(s), and [her] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). In sum, the undersigned **FINDS** that the ALJ adequately addressed Dr. Harris's opinions, and insofar as the ALJ declined to find that certain diagnoses resulted in a severe impairment, she supplied good reasons for doing so.

Claimant next argues that the ALJ "ignored" Dr. Samuel's opinion. (ECF No. 12 at 10). Again, Claimant points to her treater's diagnoses as the opinion evidence that the ALJ allegedly overlooked.[4] (*Id.*) In particular, Claimant argues that Dr. Samuel diagnosed Claimant with severe multiple tendinopathy, tenosynovitis, and a tendon and ligament tear with joint effusion in her left ankle. (*Id.*) Claimant also asserts that Dr. Samuel recommended surgery to repair the structural damage in her left foot. (*Id.*)

---

[4] The record does not contain an opinion from Dr. Samuel concerning disability or Claimant's physical or mental limitations.

In her written decision, the ALJ recognized that Claimant treated with Dr. Samuel from June 2011 to March 2012. (Tr. at 15-17). The ALJ thoroughly summarized Dr. Samuel's treatment records, including Claimant's description of her symptoms, Dr. Samuel's clinical findings, and his interpretation of any radiological studies. (*Id.*) The ALJ specifically noted that Dr. Samuel prescribed prednisone in July 2011 and that Claimant received considerable relief from that medication. (Tr. at 16). Citing Dr. Samuel's treatment notes, the ALJ wrote that "[l]ess than a month after being placed on prednisone, [Claimant] denied any ankle pain or swelling and examination of her feet on August 3, 2011 was normal." (*Id.*) The ALJ pointed out that Claimant reported significant improvement in her foot and ankle pain as well as energy level to Dr. Miller on August 8, 2011, and that Dr. Miller's examination revealed no gross amount of pain, irritation, or limited range of motion in Claimant's foot or ankle joints. (Tr. at 17). One month later, Claimant told Dr. Miller that she was doing a lot better, and Dr. Miller's examination of Claimant's feet was normal. (*Id.*) The ALJ emphasized that Claimant subsequently informed Dr. Samuel on a number of occasions that she was steadily improving with treatment until the end of February 2012, when she reported that she continued to have pain and swelling in her ankles, and Dr. Samuel recorded only minimal improvement. (Tr. at 17, 421). However, the ALJ noted that Dr. Samuel could not clinically explain Claimant's report of worsening symptoms. (Tr. at 17). Claimant sought a second opinion from Dr. Antonchak, who examined Claimant and found that Claimant exhibited moderate tenderness in her left ankle and foot; otherwise, Claimant's lower extremities were normal and her Routine Assessment of Patient Index Data score indicated she was near remission. (Tr. at 17, 360). Dr. Antonchak did not recommend surgery. (Tr. at 360). In addition, an MRI of Claimant's left ankle taken the following month revealed resolution

34

of the inflammatory changes displayed in Claimant's June 2011 MRI and showed that Claimant's condition was stable, although she continued to suffer from anatomical damage of left ankle tendons and ligaments. (Tr. at 17, 413). After that MRI, at Claimant's final appointment with Dr. Samuel on March 13, 2012, Dr. Samuel remarked that there was "no reporting to suggest any inflammatory arthritis." (*Id.*) Dr. Samuel observed that Claimant experienced very minimal tenderness on inversion movement of her left ankle; however, there was no warmth, redness, or synovitis in Claimant's ankles, and her coordination as well as muscle tone were normal. (Tr. at 17, 414). Dr. Samuel opined that there was no clinical or serological evidence of active inflammation in Claimant's ankles; still, he recommended surgical intervention to fix the structural damage in Claimant's left ankle. (Tr. at 17, 415). Despite this recommendation, the ALJ acknowledged that Claimant did not again see a physician until September 2012, when she visited Dr. Harris and her sole complaint was fatigue. (Tr. at 17, 468). At that appointment, Claimant indicated that she had been riding a bicycle for fifteen minutes each day. (Tr. at 469). Claimant next sought treatment in March 2013 for fatigue, and after a musculoskeletal examination at that visit, Dr. Harris did not record any concerning findings. (Tr. at 17, 466). Overall, the undersigned **FINDS** that the ALJ carefully considered Dr. Samuel's findings and diagnoses, as well as other evidence related to those conditions for which Claimant treated with Dr. Samuel.

Finally, Claimant contends that the ALJ "ignored" Dr. Chaney's opinion. (ECF No. 12 at 10). Specifically, Claimant emphasizes Dr. Chaney's opinion that she could occasionally carry less than ten pounds, stand and/or walk less than two hours in an eight-hour workday, and sit less than two hours in an eight-hour workday. (*Id.*) Claimant also points out that Dr. Chaney opined she was limited in her ability to push and pull using

her upper and lower extremities. (*Id.*) Finally, Claimant underscores Dr. Chaney's conclusion that she has been disabled since March 2012.[5] (*Id.*) The ALJ assigned little weight to Dr. Chaney's opinion because it was "quite conclusory" and he failed to provide an explanation of the evidence that he relied on to form his opinion. (Tr. at 18). The ALJ also recognized that Dr. Chaney was an examining physician, not a treating physician. (*Id.*)

Notwithstanding Claimant's protestation to the contrary, the ALJ clearly did not ignore Dr. Chaney's opinion. Rather, the ALJ summarized Dr. Chaney's opinion and explained why the opinion was entitled to little weight. First, the ALJ properly noted that Dr. Chaney was an examining physician, not a treating physician. (Tr. at 18). As such, the "treating physician rule" does not apply to Dr. Chaney's opinions.[6] Second, the ALJ correctly pointed out that Dr. Chaney failed to cite any evidence or provide any explanation in support of his conclusions. Instead, Dr. Chaney did nothing more than list the impairments contained on Claimant's application for benefits and check boxes related to Claimant's physical limitations. *See Hampton v. Colvin*, No. 1:14-cv-24505, 2015 WL 5304294, at *23 (S.D.W.Va. Aug. 17, 2015) (collecting cases where courts found that ALJs properly assigned little weight to treaters' opinions contained in checklist forms when treaters failed to provide explanation as to opinions contained therein), *report and recommendation adopted by* 2015 WL 5304292 (S.D.W.Va. Sept. 9, 2015); *Copley*, 2015 WL 4621641, at *28 (finding treating physician's use of check-box form without

---

[5] This opinion was on an issue reserved to the Commissioner. SSR 96-5p, 1996 WL 374183, at *2.

[6] Claimant appears to concede this point. (ECF No. 12 at 7) (noting that Claimant visited Dr. Chaney for purpose of undergoing physical RFC assessment). Curiously, however, Claimant twice refers to Dr. Chaney as a treating physician later in her brief. (ECF No. 12 at 10, 12). There is no record evidence that Dr. Chaney was Claimant's treating physician.

explaining opinions contained therein was one of several good reasons for ALJ to discount treater's opinion). Dr. Chaney failed to point to any record evidence or examination findings that supported his conclusions.

Furthermore, the severe limitations found by Dr. Chaney are seriously undermined by the ALJ's extensive discussion of the treatment records, Claimant's activities of daily living, and the other opinion evidence. As mentioned above, there is substantial evidence to support the ALJ's determination that many of Claimant's alleged impairments are non-severe. As for her foot and ankle impairment, the record demonstrates that Claimant's condition improved with treatment until February 2012 when she reported worsening symptoms. However, clinical findings related to Claimant's ankles and feet in both February 2012 and March 2012 were essentially normal, and a March 2012 MRI showed that Claimant's left ankle condition was stable when compared to a June 2011 MRI. While Dr. Samuel indicated that surgery would be required to fix the structural damage in Claimant's left ankle, she never followed up with Dr. Samuel or any other physician for the purpose of treating her foot and ankle symptoms. At subsequent appointments with Dr. Harris, Claimant's chief complaint was fatigue, and not related to her lower extremities. The improvement of Claimant's condition with medication and her failure to continue to seek treatment for her ankle and foot condition belie the serious limitations contained in Dr. Chaney's RFC assessment. With respect to Claimant's activities of daily living, the ALJ recognized that Claimant was able to care for her husband, prepare meals, perform household chores with breaks, take care of a pet, perform personal care tasks without assistance, drive a car, ride a bicycle, shop in stores, attend church services, spend time with her sister five times each week, and visit with her father. (Tr. at 13). These activities are inconsistent with the severity of the physical limitations assigned by Dr.

37

Chaney. As for the other medical opinion evidence, the ALJ assigned significant weight to Dr. Scovern's and Dr. Boukhemis's opinions that Claimant could lift and/or carry ten pounds frequently and twenty pounds occasionally; stand or walk for four hours in an eight-hour workday; sit for six hours in an eight-hour workday; and push or pull ten pounds frequently and twenty pounds occasionally.[7] (Tr. at 18). The ALJ reasoned that these opinions were based on "a thorough review of the available medical record and a comprehensive understanding of agency rules and regulations." (*Id.*) Moreover, the ALJ determined that these opinions were "internally consistent and well supported by a reasonable explanation and the available evidence." (*Id.*) As the ALJ recognized, Dr. Scovern cited treatment records and provided an explanation for his opinion as to Claimant's functional limitations, which sets his opinion apart from Dr. Chaney's opinion. In addition, Dr. Boukhemis agreed with Dr. Scovern's opinion after reviewing an additional radiological study of Claimant's left ankle. Clearly, the other medical opinion evidence weighed by the ALJ supports her assignment of little weight to Dr. Chaney's conclusions. In sum, the undersigned **FINDS** that the ALJ supplied good reasons for discounting Dr. Chaney's opinion as to Claimant's physical limitations and that those reasons are supported by substantial evidence.

### C. Combination of Impairments Equivalent to a Listing

Finally, Claimant asserts that "the totality of [her] medical and mental problems, when combined, totally disable her and meet or exceed the combination of impairments

---

[7] While the ALJ ultimately found that Claimant could stand or walk for six hours in an eight-hour workday, the ALJ acknowledged the vocational expert's testimony at the administrative hearing that Claimant could still perform much of her past work if limited to four hours of walking or standing in a workday. (Tr. at 14, 19 n.1). Indeed, the vocational expert testified that Claimant could perform many of her past positions even if limited to two hours of standing or walking. (Tr. at 19 n.2).

listing provided by the Social Security Regulations for disability." (ECF No. 12 at 11). Claimant further insists that "[t]he overwhelming and contradicted competent medical evidence from multiple medical providers confirms that the combined effect of [her] severe physical impairments render her unable to function for 8 hours in any type of job."[8] (*Id.*)

A determination of disability may be made at step three of the sequential evaluation when a claimant's impairments meet or medically equal an impairment included in the Listing. 20 C.F.R. § 404.1520(a)(4)(iii). The purpose of the Listing is to describe "for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." *Id.* § 404.1525. Because the Listing is designed to identify those individuals whose medical impairments are so severe that they would likely be found disabled regardless of their vocational background, the SSA has intentionally set the medical criteria defining the listed impairments at a higher level of severity than that required to meet the statutory standard of disability. *Sullivan v. Zebley*, 493 U.S. 521, 532, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). Given that the Listing bestows an irrefutable presumption of disability, "[f]or a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." *Id.* at 530.

To demonstrate medical equivalency to a listed impairment, a claimant must present evidence that his impairment, unlisted impairment, or combination of impairments, is equal in severity and duration to all of the criteria of a listed impairment. *Id.* at 520; *see also* 20 C.F.R. § 404.1526. Under the applicable Regulation, the ALJ may

---

[8] In this challenge, Claimant again attacks the ALJ's analysis of the opinion evidence, which is an argument that the undersigned rejects above.

find medical equivalence in one of three ways: (1) if the claimant has an impairment that is described in the Listing, but (i) does not exhibit all of the findings specified in the listed impairment, or (ii) exhibits all of the findings, but does not meet the severity level outlined for each and every finding, then equivalency can be established if the claimant has other findings related to the impairment that are at least of equal medical significance to the required criteria; (2) if the claimant's impairment is not described in the Listing, then equivalency can be established by showing that the findings related to the claimant's impairment are at least of equal medical significance to those of a similar listed impairment; or (3) if the claimant has a combination of impairments, no one of which meets a listed impairment, then equivalency can be proven by comparing the claimant's findings to the most closely analogous listings. If the findings are of at least equal medical significance to the criteria contained in any one of the listings, then the combination of impairments will be considered equivalent to the most similar impairment. 20 C.F.R. § 404.1526(b). However, the ALJ "will not substitute [a claimant's] allegations of pain or other symptoms for a missing or deficient sign or laboratory finding" in determining whether a claimant's symptoms, signs, and laboratory findings are medically equal to those of a listed impairment. *Id.*

Contrary to Claimant's assertion, however, there is no "combination of impairments" listing. Instead, the Supreme Court has explained that "[f]or a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment. ... A claimant cannot qualify for benefits under the 'equivalency' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as

severe as that of a listed impairment." *Zebley*, 493 U.S. at 531. "The functional consequences of the impairments … irrespective of their nature or extent, *cannot* justify a determination of equivalence." *Id.* at 532 (citing SSR 83-19, 1983 WL 31248).[9] "This is because the listings permit a finding of disability based solely on medical evidence, rather than a determination based on every relevant factor in a claim." *Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 710 (6th Cir. 2013) (citing *Zebley*, 493 U.S. at 532). Thus, to determine whether a combination of impairments equals the severity criteria of a listed impairment, the signs, symptoms, and laboratory data of the combined impairments must be compared to the severity criteria of the Listing. Accordingly, Claimant's assertion that "competent medical evidence from multiple medical providers confirms that the combined effect of [her] severe physical and mental impairments render her unable to function for 8 hours in any type of job," (ECF No. 12 at 11), is insufficient to establish that her combination of impairments is equivalent to a listed impairment that would warrant a finding of disability. In sum, Claimant has failed to identify any specific listing that her impairments meet or equal, and her functional impact argument is unavailing.[10] *See Copley*, 2015 WL 4621641, at *32-*33 (rejecting identical argument); *Nye*, 2014 WL 2893199, at *24-*25 (same). Moreover, to the extent that Claimant generally contends that the ALJ failed to consider all of her impairments in combination, as discussed above, the ALJ thoroughly considered all of Claimant's alleged impairments and cited medical and opinion evidence in assessing their functional impact, if any, on Claimant's ability to

---

[9] SSR 83-19 has been rescinded and replaced with SSR 91-7c, which addresses only medical equivalence in the context of SSI benefits for children. However, the explanation of medical equivalency contained in *Zebley* remains relevant to this case.

[10] At step three, the ALJ considered whether Claimant met Listing 1.00 (musculoskeletal system) and Listing 14.00 (immune system). The ALJ found that Claimant did not meet the criteria for either listing. (Tr. at 14).

perform basic work activities. Therefore, the undersigned **FINDS** that this challenge to the Commissioner's decision is without merit.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 12), **GRANT** Defendant's request for judgment on the pleadings, (ECF No. 15), and **DISMISS** this action, with prejudice, from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:**  November 24, 2015

Cheryl A. Eifert
United States Magistrate Judge